IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

MARCOS IBARRA,            )
                                )
      Plaintiff,          )
                                )
v.                             )
                                )
CITY OF TAHLEQUAH,     )
CLAY MAHANEY, individually,   )   **Case No. 12-CV-0098-JHP**
JASON GIRDNER, individually,   )
ANTONIO AGUILAR, individually,  )
SKYLAR GREEN, individually,   )
BRANDON VICK, individually,   )
WILLIAM METCALFE, individually,  )
                                )
      Defendants.       )

## OPINION AND ORDER

Before the Court are Defendants' Motion for Partial Summary Judgment [Doc. No. 91]; Plaintiff's Response in Opposition thereto [Doc. No. 100]; and Defendants' Reply to Plaintiff's Response [Doc. No. 101]. After consideration of the briefs, and for the reasons detailed below, Defendants' Motion for Partial Summary Judgment is **GRANTED** in part, and **DENIED** in part.

## BACKGROUND

### A.  Procedural History

On March 6, 2012, Plaintiff commenced this action by filing a Complaint in this Court, asserting claims arising from events occurring on December 31, 2011.  [Doc. No. 2].  Plaintiff subsequently amended his Complaint twice, first on March 19, 2012, and again on October 17, 2012. [Doc. Nos. 22, 62].  In his Second Amended Complaint, Plaintiff asserted the following claims, all brought pursuant to 42 U.S.C. § 1983:  (1) Violation of Plaintiff's Constitutional Rights by Defendant City of Tahlequah (the "City"); (2) Violation of Plaintiff's Constitutional

Rights by Defendant Clay Mahaney ("Chief Mahaney"); and (3) Violation of Plaintiff's Constitutional Rights by Defendants Jason Girdner ("Officer Girdner"), Brandon Vick ("Officer Vick"), William Metcalf ("Officer Metcalf"), Skylar Green ("Officer Green"), Antonio Aguilar ("Officer Aguilar"), and John and Jane Doe No. 1-30. [Doc. No. 62]. On January 14, 2013, this Court held a Status and Scheduling Conference, at which the parties agreed to dismiss John and Jane Doe No. 1-30. [Doc. No. 76]. On February 28, 2013, Defendants filed the Motion for Partial Summary Judgment now before the Court, seeking summary adjudication on Plaintiff's Equal Protection claim and Plaintiff's claims against the City. [Doc. No. 91].

On April 12, 2013, the parties appeared before the Court for the scheduled Pretrial Conference, at which many of the issues raised in the parties briefing on the Motion for Partial Summary Judgment were discussed. [Doc. No. 107]. On April 15, 2013, the Court entered an order requesting further briefing on seven pertinent issues: (1) individuals having final policymaking authority for purposes of municipal liability under 42 U.S.C. § 1983; (2) identification and discussion of any specific formal regulations or policy statements giving rise to municipal liability under 42 U.S.C. § 1983; (3) identification and discussion of any decisions by employees alleged to have final policymaking authority that may give rise to municipal liability under 42 U.S.C. § 1983; (4) municipal liability under 42 U.S.C. § 1983 based on a theory of ratification of subordinates decisions by final policymakers; (5) municipal liability under 42 U.S.C. § 1983 based on a failure to train employees; (6) municipal liability under 42 U.S.C. § 1983 based on a failure to supervise employees; and (7) the application of the Oklahoma Supreme Court's recent opinion in *Bosh v. Cherokee County Bldg. Auth.*, 2013 OK 9, __ P.3d __, to the instant action. [Doc. No. 108]. The parties submitted supplemental briefing

on the issues identified by the Court [Doc. Nos. 111, 112], and responses thereto [Doc. Nos. 113, 114].

**B.  *Bosh v. Cherokee County Bldg. Auth.***

As an initial matter, the Court must address Plaintiff's assertion that he may rely on the Oklahoma Supreme Court's recent opinion in *Bosh v. Cherokee County Bldg. Auth.*, 2013 OK 9, __ P.3d __,[1] to assert a claim for recovery.  [Doc. No. 111, 17-19].  Plaintiff argues that

> [b]ecause Article 2 of the Oklahoma Constitution mirrors the Fourth Amendment of the United States Constitution, and because the claim for *respondeat superior* under the Oklahoma Constitution arises out of the same circumstance and facts stated in Ibarra's Corrected Second Amended Complaint, Ibarra should be allowed to maintain a claim against the City as identified in *Bosh*.

[*Id.* at 18].[2]  In *Bosh*, the Oklahoma Supreme Court held:

> The Okla. Const. art 2, § 30 provides a private cause of action for excessive force, notwithstanding the limitations of the Oklahoma Governmental Tort Claims Act, 51 O.S.2011 §§ 151 et seq. This action is recognized retrospectively. The common law theory of *respondeat superior* applies to municipal liability under such an action to determine when an employee of a municipality uses excessive force within the scope of employment.

2013 OK 9, ¶ 33, __ P.3d at __.  Article 2, § 30 of the Oklahoma Constitution mirrors the Fourth Amendment of the United States Constitution.  Accordingly, a plaintiff may seek relief under the private right of action created by *Bosh* for violations of Article 2, § 30 of the Oklahoma Constitution.

---

[1] Defendants assert that *Bosh* is a memorandum opinion, subject to Okla. Sup. Ct. R. 1.200, which provides, in relevant part:

> (5) All memorandum opinions … shall be marked: "Not for Official Publication."… [O]pinions so marked shall not be considered as precedent by any court or cited in any brief or other material presented to any court, except to support a claim of res judicata, collateral estoppel, or law of the case. Opinions marked Not For Official Publication shall not be published in the unofficial reporter, nor on the Supreme Court World Wide Web site, nor in the official reporter.

[Doc. No. 100, 3].  Upon review of the *Bosh* decision, the Court was unable to locate any indication that the *Bosh* opinion was a memorandum opinion.  Accordingly, the Court will afford the *Bosh* decision full precedential value.

[2] Plaintiff has not sought leave to Amend his Complaint pursuant to Fed.R.Civ.P. 15(a)(2).

3

The dispositive issue is whether Plaintiff's Second Amended Complaint is sufficient to put Defendants on notice of the potential liability under this cause of action.  Fed.R.Civ.P. 8(a) sets out the relevant federal pleading standards:

> (a) Claim for Relief. A pleading that states a claim for relief must contain … (2) a short and plain statement of the claim showing that the pleader is entitled to relief … .

Rule 8(a) requires a short and plain statement of the plaintiff's *claim*, not the articulation of any particular cause of action.  While plaintiffs must plead facts sufficient to show entitlement to some relief, they need not specify any particular cause of action in order to survive a motion to dismiss.  *See Skinner v. Switzer*, 131 S. Ct. 1289 (2011); *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint claims for relief, not causes of action, statutes or legal theories.").

The Court finds that Plaintiff's Complaint contains factual allegations sufficient to satisfy the pleading standards set out in Rule 8 with regard to a claim for recovery asserted pursuant to *Bosh*.

## C.  Factual Background

### 1.  Tahlequah Police Department

The Tahlequah Police Department ("TPD") consists of a combined thirty-one (31) full-time and part-time officers. Chief Mahaney is the TPD Chief of Police, which is an elected position.   All TPD officers are required to obtain certification from the Council on Law Enforcement Education and Training ("CLEET"), including a "legal block" dedicated to training officers on civil rights.  In addition, consistent with the Oklahoma state law, TPD policy requires all officers to complete twenty-four (24) hours of continuing education training per year.[3]  It is

---

[3] The Court notes that this does not include Chief Mahaney, who testified that he has not looked at a CLEET training manual for more than ten years.  [Doc. No. 93, Ex. 1 at 54].

undisputed that at all times relevant to this lawsuit,  Officers Girdner, Aguilar, Green, Vick, and Metcalf, who are all TPD officers, were CLEET certified and in compliance with these continuing education requirements.   TPD does not, however, require officers to undergo supplemental training related to civil rights or provide independent supplemental training on civil rights.

TPD keeps a compilation of department policies and procedures (the "Policy and Procedures Manual") on the police department's computer server.  The Policy and Procedures Manual addresses a variety of issues, including civil rights.  Although officers are directed to review the information in the Policy and Procedure Manual at the time they are hired, Captain Jones, TPD's training coordinator, testified that he is not certain that all TPD officers have complied with this directive.

## 2.  Events Allegedly Occurring on the Evening of December 31, 2011[4]

On the evening of December 31, 2011, Plaintiff Marcos Ibarra, along with his girlfriend and their two children, attended a cookout with family and friends at a home in Tahlequah, Oklahoma. At approximately 10:00 p.m., Plaintiff received a telephone call from his brother, Jorge Ibarra, wherein Jorge Ibarra informed Plaintiff that he was en route to the cookout.  During that same telephone call, Jorge Ibarra also stated that Michelle Cassidy might be following him.

After Jorge Ibarra arrived at the cookout approximately ten minutes later, Plaintiff went inside the residence to prepare a plate of food for Jorge Ibarra. While in the residence, Plaintiff observed Michelle Cassidy's car on the street in front of the home turning around and driving away from the residence. Shortly thereafter, Plaintiff heard yelling and was informed that

---

[4] The events occurring on the evening of December 31, 2011, are largely disputed; however, for purposes of clarity, the Court recounts the events in a light most favorable to the Plaintiff as the non-moving party without specifically noting the numerous factual disputes.  *See* Fed.R.Civ.P. 56.

someone was outside striking his girlfriend. Plaintiff immediately exited the residence and witnessed TPD officers assaulting his girlfriend, who, at that point, was holding Plaintiff's young son in her arms.  After asking Officer Green about the events unfolding, Plaintiff was struck in the head by a TPD officer causing Plaintiff to fall to the ground, where, even after being restrained, Plaintiff claims officers continued to strike him and yell racially charged epithets. Plaintiff also claims that he saw Officer Green conduct an illegal search on his car and illegally seize $1,800 from the console of Plaintiff's car.[5]

### 3.  Plaintiff's Complaint Regarding the Events of December 31, 2011

It is undisputed that following the December 31, 2011 incident, Plaintiff met with Chief Mahaney to make a complaint.  Chief Mahaney testified that he did not investigate the incident after the complaint, because Plaintiff was "hard to understand" and "wasn't being specific on what was going on."  [Doc. No. 93, Ex. 1 at 75].  However, Chief Mahaney did understand that Plaintiff "had been arrested and … there was some police brutality or something to that effect." [*Id.* at 76].  Although Chief Mahaney testified that he usually refers complaints made against officers to a supervisor for investigation, Plaintiff's complaint was not referred and no other action was taken in response to Plaintiff's complaint.  Chief Mahaney did not create a record of Plaintiff's complaint.

### 4. Relevant Events Allegedly Occurring Prior to December 31, 2011

Prior to December 31, 2011, it is undisputed that Chief Mahaney was aware of at least one incident involving a TPD officer mistreating Hispanic residents.  Specifically, a former TPD officer, James Johnson ("Officer Johnson"), resigned after it was revealed he was conducting unlawful traffic stops on Hispanic drivers and stealing their money.  Chief Mahaney admits to

---

[5] It is undisputed that Plaintiff was not given a *Miranda* warning following his arrest.  Defendants argue that this fact is irrelevant to the Defendants Motion for Partial Summary Judgment [Doc. No. 101, 4]; however, the Court finds it relevant to the establishment of a custom or practice of disregarding the constitutional rights of Hispanic residents.

being aware of Officer Johnson's conduct, including the racial profiling Officer Johnson used to select victims. Chief Mahaney testified that after receiving complaints regarding Officer Johnson's conduct, TPD conducted an investigation, after which Officer Johnson resigned from TPD and was prosecuted by state authorities.

There is also evidence, which is disputed by Defendants, that Chief Mahaney was made aware of several other incidents involving TPD officers mistreating Hispanic residents of Tahlequah. First, Shawna Robledo ("Ms. Robledo")[6] testified that prior to December 31, 2011, she made complaints to Chief Mahaney and his predecessor about the way Hispanic residents were treated by TPD officers.[7] In addition, Plaintiff testified that he previously made complaints regarding inappropriate conduct by TPD officers prior to December 31, 2011. Further, Plaintiff testified that his mother complained to Chief Mahaney about the way she and Plaintiff were treated by a TPD officer during a traffic stop prior to the December 31, 2011 incident. It is undisputed that TPD took no corrective action, either in the form of additional training or department meetings, following Officer Johnson's resignation and prosecution, or after allegedly receiving complaints made by other Tahlequah residents.[8]

---

[6] Ms. Robledo also claims that after she reported that her brother-in-law was one of Officer Johnson's victims, Chief Mahaney asked her to act as an interpreter at a future meeting with Ms. Robledo's brother-in-law; however, there was an apparent miscommunication regarding the location of the meeting. According to Ms. Robledo, after Chief Mahaney arrived at her residence and realized that her brother-in-law was not present, Chief Mahaney used a racially charged epithet when asking where her brother-in-law was, and immediately left. Further, Ms. Robledo claims that she went to her brother-in-law's apartment to interpret and, upon her arrival, was knocked to the ground after being struck in the head by an unidentified TPD officer. While Ms. Robledo was still on the ground, the unidentified TPD officer kicked her in the leg and threatened to shoot her if she got up.

[7] Defendant asserts that Ms. Robledo's testimony regarding complaints made by other Tahlequah residents should not be considered by the Court, because it is inadmissible hearsay. An out of court statement is only hearsay, however, if "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Court finds Ms. Robledo's testimony to be admissible for the limited purpose of establishing that Chief Mahaney was put on notice of prior mistreatment of Hispanic residents by TPD officers.

[8] At his deposition, Chief Mahaney testified to the following Officer Johnson's resignation and prosecution, no meetings or additional training was held because he "d[id]n't think [TPD] ha[d] a problem." [Doc. No. 101, Ex. 1 at 119].

7

**DISCUSSION**

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**A. Fourteenth Amendment Claim[9]**

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Johnson v. Morel,* 876 F.2d 477, 479 (5th Cir. 1989) (citing *Washington v. Davis,* 426 U.S. 229, 247–48 (1976)). In the context actions brought against law enforcement officers, courts have held that police officers' use of racial epithets, which is regarded as direct evidence of racial animus, combined with harassment or other unlawful actions, may show an equal-protection violation. *See, e.g, Williams v. Kaufman County,* 352 F.3d 994, 1013 (5th Cir. 2003)

---

[9] Defendants originally sought summary judgment on Plaintiff's racial profiling claim.  [Doc. No. 91, 8].  In his Response in Opposition to Defendants' Motion for Partial Summary Judgment, Plaintiff asserted that he "never specifically raised a claim for 'racial profiling.'"  [Doc. No. 93, 12].  Instead, Plaintiff argued that he has met his burden with regard to a claim for "racial harassment" claim, and, significantly, did not present argument specifically opposing summary judgment on the racial profiling claim identified in Defendants' motion.  Although the Court construes Plaintiff's claim as one for racial harassment, the Court notes that, after review of the record before the Court, summary judgment would be appropriate on a racial profiling claim.

("We have impliedly held that racial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation." (citing *Williams v. Bramer,* 180 F.3d 699, 706 (5th Cir. 1999)); *Cole v. Fischer,* 379 F. App'x. 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion."); *King v. City of Eastpointe,* 86 F. App'x. 790, 814 (6th Cir. 2003) ("The use of racially discriminatory language can provide some evidence of a discriminatory purpose when that language is coupled with some additional harassment or constitutional violation."); *Burton v. Livingston,* 791 F.2d 97, 100 (8th Cir. 1986) ("[W]hen the racially derogatory language is coupled with conduct infringing the prisoner's right to security of his person, an inference arises that the conduct was motivated by racial bias.").

In sum, in order to prevail on his claim for racial harassment in violation of the Equal Protection Clause, Plaintiff must prove both that (1) the Defendant officers engaged in harassing behavior or violated one of Plaintiff's established rights, and (2) the Defendant officers' actions were racially motivated.  The Court finds there are disputed questions of fact as to whether Plaintiff's constitutional rights were violated by Defendants on the evening of December 31, 2011.  The Court also finds that there are disputed questions of fact as to whether these alleged violations were racially motivated.  Accordingly, Defendants' motion for summary judgment is denied on the Plaintiff's equal-protection claim.

## B. Municipal Liability Under 42 U.S.C. § 1983

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials

responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Academy,* 602 F.3d 1175, 1188 (10th Cir. 2010) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483-84 (1986)).  "[A municipality] cannot be held liable for the acts of its employees on a theory of *respondeat superior.*"  *Id.* at 1188.  As a result, the City cannot be made vicariously liable for acts of the individual officers under 42 U.S.C. § 1983.  Rather a plaintiff must establish both (1) a municipal policy or custom, and (2) a direct causal link between the policy or custom and the alleged injury. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).

A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law' "; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Brammer-Hoelter*, 602 F.3d at 1189-90  (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) and *City of Canton v. Harris,* 489 U.S. 378, 388-91 (1989)) (internal quotation marks omitted).

**1.  Final Policymaker**

At the outset, the Court must ascertain which individuals possessed final policymaking authority.  The issue of final policymaking authority is a legal issue for the Court to determine after review of state and local law.  *Praprotnik,* 485 U.S. at 123.  Making this determination,

which has been referred to as drawing an "elegant line," involves a fact-specific inquiry into the municipality's legal chain of authority. *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

The Tenth Circuit has announced three factors to be considered in determining whether an individual is a final policymaker: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Id.* (internal quotations omitted); *see also Praprotnik,* 485 U.S. at 127; *Ware v. Unified School Dist.,* 902 F.2d 815, 818 (10th Cir. 1990) ("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker.").

To determine whether an individual holds final policymaking authority, courts begin by examining the legal chain of authority. *See Jantz v. Muci,* 976 F.2d 623, 631 (10th Cir. 1992) (school board not liable for school principal's actions because the school board had ultimate legal authority to review decisions involving the hiring and firing of employees); *Ware,* 902 F.2d at 819 (municipality not liable because the principal, who fired the plaintiff, was not the final policymaker on personnel matters, as he was not vested with such authority and any decisions he made were reviewable by the school board); *Wulf v. City of Wichita,* 883 F.2d 842, 868-69 (10th Cir. 1989) (municipality not liable because the police chief who fired plaintiff was not the final policymaker of the city's personnel policy nor was the police chief's decision and the basis for it ratified by the city manager who had the legal authority to hire and fire employees).  In order for a review procedure or constraint to divest an individual of final policymaking authority, it "must

11

be *meaningful—as* opposed to merely hypothetical….” *Randle*, 69 F.3d at 448-49 (emphasis original) (citing *Melton v. City of Oklahoma City,* 879 F.2d 706, 724 n. 24 (10th Cir. 1989) (although not explicitly addressing its significance, charter provision that all personnel decisions were to be made solely based upon “merit and fitness” did not immunize City from liability based upon City Manager's personnel decision); *Flanagan v. Munger,* 890 F.2d 1557, 1569 (10th Cir. 1989) (“[F]or all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review [by the City Council or City Manager] is illusory.”); *Starrett v. Wadley,* 876 F.2d 808, 818-19 (10th Cir. 1989) (“Wadley had final authority to set employment policy as to the hiring and firing of his staff,” because City did not offer any “meaningful avenues of review”)).

The parties identify different individuals as final policymakers for the TPD. Citing provisions contained in the Tahlequah City Charter (the “City Charter”), the City argues that members of the City Council and the Mayor are the final policymakers for the TPD. [Doc. No. 112, 5]. Plaintiff, essentially arguing that the provisions in the City Charter are not dispositive, contends that Chief Mahaney is the final policymaker for the TPD. [Doc. No. 111, 5]. In the alternative, Plaintiff also argues the Mayor is a final policymaker. [*Id.* at 8]. As discussed at length below, the Court finds that Chief Mahaney possesses final policymaking authority with regard to police department policies and procedures.

The Court first examines the legal chain of authority, which is set out in the City Charter. [Doc. No. 101, Ex. 10]. Article IV, Section 24 of the City Charter provides the following:

> The legislative branch of the city government shall consist of a city council composed of four (4) councilors and the mayor. The council shall exercise such legislative powers as may be authorized by and not inconsistent with the general laws of the State of Oklahoma, and shall set up such judicial authority as it may find necessary to enforce the ordinances of the city. The council shall have

executive authority over all affairs of the city, except those specifically delegated to the Utility Board hereinafter provided for.

[Doc. No. 101, Ex. 10 at 6].  With regard to the mayor's authority, Article VI, Section 68

of the City Charter provides:

> D.  The mayor shall be the chief administrative officer of the city and shall have charge and supervision of all branches of the city service except as otherwise in this charter provided.
> …
> F. The mayor or the council, with the approval of the council, shall have power to dismiss any officer or employee appointed by the mayor or council with approval of the council' whenever the interests of the City so require, except as herein provided.
>
> G. The mayor shall control and direct the several officers and departments of the city administration except as hereinafter provided.
>
> H. The mayor shall have power at any time to investigate the affairs of any department. The mayor, or any other person appointed by the mayor for the purpose, shall have power to compel the attendance of witnesses and the production of books, papers and other evidence.

[*Id.* at 13-14].

The police department is specifically created by Article VII, Section 70 of the City

Charter, which provides:

> The city administration under the mayor shall be arranged into a police department, a street department, a fire department, a utility board and such other departments as the council may prescribe by ordinance. … The police department shall consist of a chief of police, and as many police officers as may he [*sic.*] provided for.

[*Id.* at 14-15].  Pursuant to Article IV, Section 40 of the City Charter, the chief of police, an

elected official, "shall enforce the laws of the State of Oklahoma and the City of Tahlequah."

[*Id.* at 9].  Further, the chief of police, "in the discharge of [his or her] duties, shall be subject to

the legal orders of the mayor and council."   [*Id.*]   The City argues that these provisions

conclusively establish that the mayor and city council have "the final responsibility for setting

policy and making law in the area of the police department."  [Doc. No. 112, 6].  The Court

disagrees.

The Court finds that the City Charter is inconclusive on the issue of final policymaking

authority for police department policy and procedure.  In *Dill v. City of Edmond, Oklahoma*, the

Tenth Circuit Court of Appeals addressed similar factual circumstances, explaining,

> The portion of the city charter contained in the record does not designate
> responsibility for city employment decisions such as transfers and discipline. The
> charter does state that the city manager is the "administrative head of the
> municipal government, under the direction and supervision of the mayor and
> council." The Edmond Municipal Code expands on the role of the city manager,
> stating that the manager has authority to "appoint and to remove at pleasure all
> directors and heads of departments and all subordinate officers and employees in
> such departments...." The code also provides that the city manager has direct
> responsibility for the department of police services and that this department is
> "headed by the Police Chief." Neither the code nor the charter limits
> policymaking authority to the mayor or the city council. Although the code states
> that the city manager has the authority to hire and discharge employees, the
> regulations do not speak directly as to who has authority to determine policy
> regarding employee transfers and discipline. In light of the city's charter and code,
> and the other evidence presented at trial and discussed below, we conclude that
> Vetter was a final policymaker in regard to police department personnel transfers.

155 F.3d 1193, 1211 (10th Cir. 1998).  Here, while the City Charter does give the mayor and city

council authority to issue official orders that would constrain the authority of the chief of police,

there is no evidence in the record indicating that any such orders have been promulgated.

Further, the City Charter does not limit policymaking authority exclusively to the mayor or city

council or require the chief of police to seek approval from the city council before deciding to

take a particular course of action.  Accordingly, the Court must look to other relevant evidence to

determine if an individual possesses final policymaking authority.  *See id*.[10]

---

[10] After concluding that portions of the municipal defendant's charter and city code in the record were inconclusive
as to final policymaking authority, the *Dill* Court found evidence that the chief of police took action regarding
transfers in the past without approval from the city manager; the police chief's testimony that "he had authority to
establish police department policies including those regarding officer transfers"; and a police department procedure
stating that the "chief of police shall have the discretion to transfer any member" of the department sufficient to

Plaintiff argues that Chief Mahaney's testimony indicates that he possesses final policymaking authority with regard to the policies and procedures of the police department. At his deposition, Chief Mahaney gave the following testimony:

> [Q.]    Have you personally approved or enacted any policies or procedures since you've been in office?
> A.      Yes.
> Q.      And what are those?
> A.      The domestic violence portion of the SOPs was revised.
> Q.      And when you say it was "revised," what role did you have in the revision of that policy?
> A.      I looked over it after it had been revised, and then provided it to council for approval, after I'd got with the people who I had investigating and writing it for me.

[Doc. No. 111, Ex. 1 at 37]. Chief Mahaney also testified to the following:

> Q.      You're at the top of the food chain; correct?
> A.      Yes.
> Q.      I mean, when it comes to a police decision, the buck stops at your desk.
> A.      It does.

[Doc. No. 93, Ex. 1 at 17]. In addition, when Ms. Robledo, a citizen of Tahlequah, attempted to report alleged mistreatment of her nephews by Tahlequah police officers to the mayor, she was informed that the mayor was not Chief Mahaney's supervisor. [Doc. No. 93, Ex. 5 at 33]. The testimony of Chief Mahaney and Ms. Robledo certainly suggests that neither Chief Mahaney, nor the mayor believed that Chief Mahaney's authority was constrained by other city officials.

Chief Mahaney's testimony, however, does indicate that changes to standard operating procedures have been approved by the city council in the past. Further, the record also includes portions of the Policies and Procedures Manual regarding racial profiling, drugs and organized crime, and the use of force, which were approved by both the chief of police and the city council. [Doc. No. 91, Ex. 10]. Thus, it appears that Chief Mahaney has the power to enact TPD policies

---

support a finding that the police chief possessed final policymaking authority with regard to interdepartmental transfers. 155 F.3d at 1211.

and procedures, but they are subject to approval by the city council.  This is not dispositive, however, because there is no evidence indicating that city council approval is not merely perfunctory in nature—particularly in light of the deposition testimony referenced above.

Plaintiff argues that "[e]ven though the City Council has final approval of the internal policies and procedures of the police department, this alone is not enough to dispute that Mahaney is the delegated policymaker for the City as it relates to the police department."  [Doc. No. 111, 2, n.2].  In support of this argument, Plaintiff cites *Zarnow v. City of Wichita Falls, Texas*, 614 F.3d 161, 168 (5th Cir. 2010), for the proposition that the division of power between separate governing bodies and the existence of some residual oversight is insufficient to dispute the existence of a designated policymaker.  In *Zarnow*, the Court explained that a city could implicitly delegate final policymaking authority:

> A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) "it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role."  There is no express delegation here.

> As evidence of the City's conduct or practice, Zarnow produced several "General Orders" issued by the chief of police to the police department.  Each General Order begins with the language, "It is the policy of this department ... " and proceeds to set out regulations addressing specific behaviors.  These orders are binding on the officers until reviewed, altered, or changed by the City Manager or City Council.  Zarnow asserts that the chief's general power to issue such orders establishes a custom by which the chief creates law enforcement policy for the City. …

> The nature of the administrative oversight is important in determining "policymaker" status.  An official may be a policymaker even if a separate governing body retains some powers.  An official may be termed a "policymaker" even if the municipality retains "the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official."  Further, the subject matter of administrative review must be precise in order to attach the presumption against policymaking.  "The mere existence of oversight, however, is not enough; the oversight must pertain to the area of authority in question."

*Id.* at 167, 168 (internal citations omitted).   Therefore, Chief Mahaney is not divested of final policymaking authority simply because the city council and mayor retain some authority over TPD operations.

After careful review of the record before the Court, the Court finds that Chief Mahaney is the final policymaker with regard to TPD policies and procedures.   While the record contains evidence sufficient to find that Chief Mahaney's decisions *could be* meaningfully constrained by orders promulgated by the mayor and city council, there is simply nothing in the record indicating that Chief Mahaney's decisions *have been* meaningfully constrained.   Also significant is Chief Mahaney's status as an elected official, which, when coupled with the testimony before the Court indicating both Chief Mahaney and the mayor believe that Chief Mahaney has the final word with regard to police department policy and operations, is highly probative of final policymaking authority.   Accordingly, the Court finds that Clay Mahaney is the final policymaker with regard to police department policies and procedures.[11]

## 2. Municipal Policies or Customs

Plaintiff alleges that his injuries were caused by various municipal policies or customs. Specifically, Plaintiff alleges municipal liability based on the following policies or customs:  (a) the police department's failure to adequately train or supervise police officers; (b) the police department's failure to investigate complaints of improper treatment of Hispanic residents by TPD officers; (c) the custom of disregarding the rights of Hispanic residents; and (d) negligent hiring practices.   The Court evaluates each of these contentions below in order to determine which, if any, give rise to municipal liability.

---

[11] Because the Court finds that Chief Mahaney is the final policymaker with regard to police department policy and procedure, it does not address Plaintiff's theory that Chief Mahaney's actions were ratified by individuals with final policymaking authority.   [Doc. No. 111, 10].   The Court notes, however, that even if Chief Mahaney did not have final policymaking authority, the City would still be subject to municipal liability under a theory of delegation of final policymaking authority.

**a. Failure to Train or Supervise**

Where law enforcement conduct is at issue, § 1983 municipal liability may also be premised on a failure to train or supervise personnel. *Allen v. Muskogee,* 119 F.3d 837, 841–42 (10th Cir. 1997).  Municipal liability based on a failure to train or supervise is based on the idea that a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks omitted). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).  As such, a municipality may be held liable for "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Brammer-Hoelter,* 602 F.3d at 1190 (citations omitted). The Tenth Circuit has explained the evidence required to establish deliberate indifference for this purpose:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Bryson v. City of Okla. City,* 627 F.3d 784, 789 (10th Cir. 2010) (citing *Barney v. Pulsipher,* 143 F.3d 1299, 1307–08 (10th Cir. 1998)). Evidence that police officers violated certain policies is

not sufficient to show the officers were inadequately trained, however, because "a municipality's failure to train 'must reflect a deliberate or conscious choice by the municipality.'" *Zuniga v. City of Midwest City,* 68 F. App'x 160, 164 (10th Cir. 2003) (unpublished opinion) (quoting *Barney,* 143 F.3d at 1307); *Lewis v. McKinley,* 425 F. App'x 723, 726 (10th Cir. 2011); *see also Bryson,* 627 F.3d at 789 ("the City cannot be held liable for its failure to train or supervise ... unless the City's policymakers 'can reasonably be said to have been deliberately indifferent to the need' for further training or supervision").   "This may be demonstrated 'when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" *Lewis,* 425 F. App'x at 726 (quoting *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998)).

Plaintiff argues the City should be subject to municipal liability for failing to adequately train and supervise police officers.[12]   The City points out that all Tahlequah police officers are required to be CLEET certified, which includes training on the constitutional rights of citizens. [Doc. No. 101, 11].   The City also notes that employees are required to read the Policy and Procedure Manual, which includes sections regarding constitutional rights.   [*Id.*]   While this evidence is sufficient to establish a baseline of training, it is not dispositive because every department requires different training depending on that past conduct by officers in a department

---

[12] In his brief, Plaintiff refers to testimony given by the Defendant Girdner, Chief Mahaney, and Captain Jones, TPD's training coordinator, wherein these individuals stated they were unaware of the individual rights guaranteed by one or more of the Fourth, Fifth, Eighth, or Fourteenth Amendments to the Constitution.  [Doc. No. 93, 28].  To be sure, the Court recognizes that a police officer's unfamiliarity with the amendment number associated with a particular right is not necessarily indicative of unfamiliarity with the substantive rights guaranteed by the Constitution. Irrespective of the probative value of these statements, it goes without saying that law enforcement officials, to whom the public entrusts the weighty power to act under the color of law, should be particularly cognizant of the constraints placed upon them by the Constitution.

and the situations officers are likely to face in the future.[13]  Thus, the relevant inquiry is whether officers were adequately trained in light of the surrounding circumstances.  The Supreme Court echoed this sentiment in *City of Canton, Ohio v. Harris*, explaining,

> The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."  It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390.  Accordingly, the Court must look past the standard training provided to the Defendant officers by TPD, and examine the totality of the circumstances.

The evidence in the record before the Court, when viewed in a light most favorable to the Plaintiff, is sufficient to establish that Chief Mahaney, the final policymaker with regard to TPD policies and procedures, was put on notice of potential constitutional violations prior to December 31, 2011.  As the Court outlined in detail above, Chief Mahaney allegedly received numerous complaints regarding the treatment of Hispanic residents by police officers.  Significantly, at least one TPD officer, Officer Johnson, was confirmed to have been targeting Hispanics for unlawful traffic stops, and stealing cash from them during these encounters.  Following the discovery of Officer Johnson's unlawful conduct, the police department conducted an investigation, and Officer Johnson was prosecuted and resigned from the police department.  Chief Mahaney testified that everyone in the police department was aware of the incident and the

---

[13] The Court notes that Chief Mahaney echoed this very sentiment, acknowledging that every department has its own unique set of challenges.  [Doc. No. 111, Ex. 1 at 52].

police department's response.[14]  There is also evidence in the record that Chief Mahaney failed to require officers to complete additional training or other relevant action after receiving the complaints and discovering Officer Johnson's unlawful conduct.

Based on the record before the Court, there is sufficient evidence, which, if believed by a jury, would support a finding of deliberate indifference to the need for additional training on civil rights matters.  Further, there is sufficient evidence to find that the failure to correct the alleged deficient training on issues of civil rights was the driving force behind Plaintiff's injuries.  Accordingly, summary judgment is denied on the issue of municipal liability for failure to adequately train or supervise.

**b. Failure to Properly Investigate or Respond to Complaints**

Plaintiff also asserts that the City is liable for failure to properly investigate or respond to complaints made prior to December 31, 2011, by Chief Mahaney.[15]  Courts have held that a municipality that fails to investigate or effectively respond to citizen complaints may be liable for constitutional deprivations resulting from that failure under §1983.  *See Beck v. City of Pittsburgh,* 89 F.3d 966, 974 (3rd Cir. 1996) (reversing summary judgment in favor of city upon finding that evidence creates a jury question as to whether Pittsburgh's investigatory procedures against officers were adequate); *Vann v. City of New York,* 72 F.3d 1040 (2nd Cir. 1995)

---

[14]   In their briefs, Defendants attempted to persuade the Court to view Officer Johnson's conduct in a vacuum, without regard for the other allegedly reported improper conduct directed toward Hispanic residents of Tahlequah, arguing that one isolated incident cannot be the basis for municipal liability for failure to train or supervise.  [Doc. No. 101, 10; Doc. No. 114, 8].  The Court must, however, weigh Officer Johnson's conduct in light of all of the alleged conduct, particularly where, as here, municipal liability is based in part on a failure to act. *See Harris*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.").

[15] Plaintiff also claims municipal liability based on the city mayor's failure to adequately respond to Ms. Robledo's complaints.  However, in light of the Court's determination that Chief Mahaney is the final policymaker in the area of police conduct, policy and procedure, the Court need not address this argument.

(summary judgment reversed where there exists a question of fact as to whether police system showed deliberate indifference in monitoring complaints); *Parrish v. Luckie,* 963 F.2d 201 (8th Cir. 1992); *Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir. 1991); *Monaco v. City of Camden,* 2008 WL 8738213, at *9, 2008 U.S. Dist. LEXIS 30825, at *34 (D.N.J. Apr. 14, 2008) ("[I]f, as Plaintiff argues, the City failed to conduct adequate investigations into excessive force complaints, then a heightened inclination of police officers to use excessive force would be a 'highly predictable consequence' of the City's inaction." (quoting *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 409 (1997)).

"Under this precedent, a plaintiff must prove (1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008) (citing *Gates v. Unified Sch. Dist. No. 449 of Leavenworth County, Kan.,* 996 F.2d 1035, 1041 (10th Cir. 1993)); *see also P.H. v. Sch. Dist. of Kan. City, Mo.,* 265 F.3d 653, 658–59 (8th Cir. 2001)**.**  Based on the record before the Court, there is sufficient evidence, which, if believed by a jury, would support a finding of municipal liability based on Chief Mahaney's allegedly inadequate investigation and response to complaints regarding the unlawful treatment of Hispanic residents of Tahlequah.   Further, a reasonable jury could certainly find the complaints Chief Mahaney allegedly received sufficient to establish a continuing, widespread, and persistent pattern of misconduct by TPD officers resulting in Plaintiff's injuries. Accordingly, summary judgment is denied on the issue of municipal liability for failure to adequately train or supervise.[16]

---

[16] The Court does not address Plaintiff's argument that a custom of requiring excessive amounts of evidence to be presented by a resident complaining of police misconduct might also be sufficient to subject the City to municipal

### c. Custom of Targeting Hispanic Residents

Plaintiff also alleges municipal liability based on a custom of targeting Hispanic residents for mistreatment, including systematic violations of those citizens' constitutional rights.  The requisite official policy or custom may be a formal regulation or policy statement, or it may be based on an informal "custom" that rises to the level of "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Praprotnik,* 485 U.S. at 127 (*quoting Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68 (1970)).

The Court finds Plaintiff's evidence, when viewed in a light most favorable to Plaintiff, sufficient to establish a custom or practice of disregarding the rights of Hispanic residents of Tahlequah.  Specifically, Plaintiff produced evidence of numerous alleged incidents wherein Tahlequah police officers disregarded the obvious constitutional rights of Hispanic residents of Tahlequah, often with the inclusion of racially charged epithets.  Plaintiff also produced undisputed evidence that one former TPD officer systematically disregarded the rights of Hispanic residents in conformity with the alleged custom.  In addition, on the evening of December 31, 2011, the night of the alleged violation of Plaintiff's rights, it is undisputed that TPD officers failed to Mirandize Plaintiff, which, because Plaintiff is a Hispanic resident of Tahlequah, is also evidence of an established custom of disregarding the rights of Hispanic residents of Tahlequah.  Further, the Court finds the evidence in the record sufficient to support a finding by a reasonable jury that the police department's alleged custom of targeting Hispanic citizens was the driving force behind the alleged violation of Plaintiff's constitutional rights.

---

liability, because Chief Mahaney, as the final policymaker with regard to police investigatory conduct, is considered to have been acting on behalf of the City when he required such information.  [Doc. No. 111, 10].  The Court notes, however, that even if Chief Mahaney were not the final policymaker, there is sufficient evidence in the record to support a finding that a custom or practice of inadequate investigation was the driving force of the alleged violation of Plaintiff's constitutional rights.

Accordingly, summary judgment is denied on the issue of municipal liability based on a custom or policy of disregarding the rights of Hispanic residents.

**d. Negligent Hiring**

Plaintiff also alleges municipal liability based on the process by which the police department hired reserve officers.  Courts that have considered the elements of a § 1983 claim alleging liability arising from a municipality's hiring policies or practices have concluded that, "[i]n order to prove that a municipal hiring or training policy violated his rights under § 1983, [a plaintiff] must show that (1) the training or hiring procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and (3) the inadequate hiring or training policy directly caused the plaintiff's injury." *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir. 1992) (citing *Harris,* 489 U.S. at 388–92 (1989)); *see also Andrews v. Fowler,* 98 F.3d 1069, 1076 (8th Cir. 1996).  The Court finds no evidence in the record to support this theory of municipal liability. Specifically, there is no evidence that Chief Mahaney was put on notice that the police department's method of hiring reserve officers was substantially certain to cause an injury of the sort allegedly suffered by Plaintiff.  Accordingly, summary judgment is granted on the issue of municipal liability based on the process by which the police department hired reserve officers.

## CONCLUSION

For the reasons outlined above, Defendants' Motion for Partial Summary Judgment is **GRANTED** in part, and **DENIED** in part.

IT IS SO ORDERED this 13th day of May, 2013.

James H. Payne
United States District Judge
Eastern District of Oklahoma